```
                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF INDIANA
                         LAFAYETTE DIVISION


BONDED FIBERS MIDWEST, INC.,    )
                                )
            Plaintiff           )
                                )
       v.                       )   Case No. 4:05 cv 28
                                )
WILLIAM C. BOUNDS a/k/a Chuck   )
Bounds; JORDAN MANUFACTURING    )
COMPANY, INC.; DAVID N. JORDAN; )
JAMES GEYER; ABC CORPORATION,   )
INC.,                           )
                                )
            Defendants          )
```

OPINION AND ORDER

This matter is before the court on the Motion for Temporary Restraining Order filed by the plaintiff, Bonded Fibers Midwest, Inc., on April 13, 2005. For the reasons set forth below, the motion is **DENIED**.

Procedural Background

On April 13, 2005, Bonded Fibers filed a complaint along with a motion for temporary restraining order and a motion for preliminary injunction. This matter was assigned to District Judge Allen Sharp and the undersigned magistrate judge. On April 15, 2005, Judge Sharp referred all of the dispositive motions to this court pursuant to 28 U.S.C. ß636(b). A hearing on the motion for temporary restraining order was conducted on April 28, 2005. Prior to the hearing, all parties executed consent forms conferring jurisdiction on this court under 28 U.S.C. ß636(c).

At the hearing, Gregory Trunk, the vice president of Bonded Fibers testified consistent with the affidavit filed in support

of the motion.  Bonded Fibers also offered five exhibits into evidence.  James Geyer was the only defendant who testified.

At the conclusion of the hearing, the only relief which Bonded Fibers requested was an injunction prohibiting the defendants from contacting any of the current Bonded Fibers customers. The parties were advised that the motion was denied and that this written order would follow.

Findings of Fact

1.  Bonded Fibers is a corporation with its principal place of business in Wisconsin.  Trunk has been vice president of Bonded Fibers for ten years and has primary responsibility for operating the Wisconsin facility.

2.  Bonded Fibers produces non-woven textiles, or thermal bonded and spray bonded polyester fibers, at its Wisconsin facility.  These products primarily are used for filtration, furniture, and bedding products.  The Wisconsin facility has 42 employees.

3.  The defendant, William C. Bounds, is a former employee of Bonded Fibers.  Bounds first worked as an independent contractor for Bonded Fibers as a salesman at its Kentucky facility. Bounds later was hired as an employee and transferred to the Wisconsin plant when the Kentucky plant was closed.

4.  Bounds and Trunk were the primary salesmen for Bonded Fibers until Bounds tendered his resignation in January 2005.

5.  The defendant, James Geyer, was hired by Bonded Fibers in 2000.  Geyer originally was hired to perform maintenance on

2

the Bonded Fiber machines but later was promoted to a production supervisor.  Because of an ongoing dispute with Trunk, Geyer was returned to maintenance shortly before his resignation in September 2004.

6.  The defendant, Jordan Manufacturing Company, Inc., has its principal place of business in Indiana.  The defendant, David N. Jordan, is the president of Jordan Manufacturing.

7.  Prior to 2005, Jordan Manufacturing was one of the largest customers of Bonded Fibers.  Bounds was the primary sales representative for Jordan Manufacturing, but Trunk frequently would contact Jordan to maintain the business relationship.

8.  In 2003, Jordan Manufacturing purchased approximately $450,000 of materials from Bonded Fibers.  The amount of purchases dropped to approximately $300,000 in 2004, and no purchases have been made in 2005.  Jordan Manufacturing owes over $175,000 for its last shipment.

9.  The fabrics produced by Bonded Fibers are custom made for each customer.  At times, the customers provide Bonded Fibers with the specifications for the product.  Other times the product is designed through the process of reverse engineering.  In other words, the customer provides a sample to Bonded Fibers, and through experimentation, Bonded Fibers produces a fabric that conforms to the customer's specifications.

10.  Because of the trial and error process, reverse engineering can be expensive.  After a satisfactory product has been

developed, Bonded Fibers prepares a set-up sheet or "recipe" for each customer.

   11.   The set-up sheets currently are stored on a computer and protected by a password.  Trunk was unable to indicate when the computer system was installed.  A limited number of Bonded Fibers' employees have the password.

   12.   Trunk has developed a computer program to determine the cost of producing an order.  This program relies upon the set-up sheets along with the cost of materials, the amount of labor involved, and shipping expenses.  Once the weight of the finished product is factored into this program, the cost to the customer is determined.  This program also is protected by a password.

   13.   Because of shipping costs, most of Bonded Fibers' customers are within 500 miles of its Wisconsin facility.  In this limited geographical area, Bonded Fibers has approximately six competitors.  Nationwide, approximately 12 companies are in a competing business.

   14.   Prior to 2004, only Trunk had a confidentiality agreement with Bonded Fibers.  His confidentiality agreement was part of a long-term employment contract.

   15.   Neither Bounds nor Geyer had an employment contract with Bonded Fibers and were employees at will.

   16.   As previously stated, Bounds worked as an independent contractor selling Bonded Fibers' products before he was hired as a full-time employee.  As such, he had extensive experience in the non-woven textile industry prior to his employment.

4

17.  Geyer has worked in the textile industry since 1997. One of the reasons he was hired by Bonded Fibers was because of his expertise in maintaining and repairing the production machinery.

18.  Prior to Labor Day weekend in 2004, Geyer requested time off to visit his sick father in Oklahoma.  Geyer also took a vacation the week following Labor Day.

19.  Geyer was issued a cell phone by Bonded Fibers so that he could be contacted if there were any production problems. During his absence, Trunk was unable to reach him on his cell phone.

20.  Geyer tendered his resignation without returning to work.  Trunk reviewed the records for Geyer's cell phone after his resignation and determined that the cell phone had not been used the week following Labor Day.

21.  Bruce Wittert is the president of Air Flow Technology, Inc., a major customer of Bonded Fibers.  On November 11, 2004, Trunk had a meeting with Wittert at the Air Flow plant.  During this meeting, Wittert told Trunk that Bounds and Geyer had approached him about becoming a partner in a new production facility which they were starting.

22.  Because Bounds did not have an employment contract or a non-compete agreement, Trunk was concerned about Bounds working for another company and soliciting Bonded Fibers' customers. Bounds contacted his attorney who drafted a non-compete agreement.

23.  Shortly after the November 11 meeting with Wittert, Trunk gave Bounds a proposed non-compete agreement.  Bounds never gave any indication whether he would sign the agreement but rather indicated that he wanted to confer with his attorney.

24.  During his conversation with Wittert, Trunk also may have learned that Geyer had been hired by Jordan Manufacturing.  In fact, Geyer was hired by Jordan Manufacturing on October 7, 2004.  Bounds had contacted Geyer after he terminated his employment with Bonded Fibers and made the employment arrangements with Jordan Manufacturing.

25.  Bonded Fibers always gives its customers a Christmas gift, and Trunk delivers the gifts personally.  Most of the time, Trunk contacts the customer about one hour before arriving at the customer's business.

26.  In December 2004, Trunk delivered the Christmas gift to Jordan at the Jordan Manufacturing facility.  Jordan was expecting Trunk, and the only person who Trunk had told of the visit ahead of time was Bounds.

27.  While Trunk was at the Jordan Manufacturing facility, he noticed some sample products produced by Bonded Fibers.  This caused him to be suspicious.  Two days later, Trunk called Jordan Manufacturing and asked to speak to Geyer.  According to Trunk, this was the first time he learned that Geyer was working as the plant manager for Jordan Manufacturing.

28.  Later in December 2004, Trunk drove past the Jordan Manufacturing facility and saw the personal cars of Bounds and

6

Geyer parked in a remote location of the facility.  Trunk was surprised to see Bounds' car because Trunk had not asked Bounds to contact Jordan Manufacturing at that time.

29.  The next day, Trunk called Bounds and confronted him with what he had seen at Jordan Manufacturing.  Once again, he asked Bounds about signing the non-compete agreement.

30.  Trunk and Bounds agreed to meet in January 2005.  Trunk had instructed Bounds to bring the non-compete agreement to the meeting.  Shortly before the meeting, Bounds called and tendered his resignation.

31.  Bounds was issued a car and a laptop computer by Bonded Fibers.  When he tendered his resignation, Bounds told Trunk that he had left the car and laptop at the resort where he stayed when he was at the Wisconsin facility.

32.  When the laptop was examined, three memos were recovered.  Each of these memos dealt with a proposed agreement between Bounds and Jordan Manufacturing to set up a competing business.

33.  After Bounds' resignation, Trunk reviewed the records for Bounds' cell phone.  Bounds had taken a vacation the week following Labor Day, 2004.  Like Geyer, Bounds had not used his cell phone during that week.

34.  After learning that Jordan Manufacturing, with the assistance of Bounds and Geyer, had established a competing business, Trunk personally contacted the customers of Bonded Fibers in an effort to retain their business.  During one of

7

these visits, Trunk learned that a customer had purchased one truck load of materials from Jordan Manufacturing.

    35.  Jordan Manufacturing has located the competing business in Monticello, Indiana, approximately 200 miles from the Bonded Fibers plant and within its primary distribution area.

    36.  In Trunk's opinion, it would take Jordan Manufacturing at least six months to develop a customer base without the assistance of Bounds and Geyer.

    37.  In 2004, Bonded Fibers had 34 customers including Jordan Manufacturing.

    38.  Bonded Fibers does not have any contracts with any of its customers.  Each order is handled through an invoice, and none of the companies has agreed to purchase a specific amount in any calendar year.

    39.  The customers do not sign any confidentiality agreements with Bonded Fibers agreeing not to provide any billing information to a competitor in an effort to obtain a more favorable price.

    40.  The customers also have not signed any agreement prohibiting them from providing a sample of the Bonded Fibers product to a competitor to obtain another price quotation.

    41.  Although Bonded Fibers maintains set-up sheets for all of its customer orders, the recipe frequently is "tweaked" during the production process.  In fact, even the temperature in the plant may require an adjustment of the recipe.  Once these

adjustments are made, they are noted on the set-up sheet for future reference.

 42. Although Bounds and Geyer both had access to the set-up sheets, Trunk indicated that he had no information that either Bounds or Geyer made copies of any of the recipes before their resignations.

 43. The primary machine at both Bonded Fibers and the competing Jordan Manufacturing business is the Fehrer K-12. Jordan Manufacturing purchased two additional Fehrer machines, a B-21R and a second machine which feeds the materials into the system.

 44. Geyer advised Jordan Manufacturing on what machines to purchase.

 45. According to Geyer, the production process at Jordan Manufacturing is different than the process at Bonded Fibers. Because of these differences, the information contained in the Bonded Fibers set-up sheets would not assist in the production process at Jordan Manufacturing.

## Conclusions of Law

Although Bonded Fibers asked for both a preliminary injunction and a temporary restraining order in its motion, upon agreement of the parties, the court only addresses the temporary restraining order here.  Additionally, Bonded Fibers clarified during oral argument that it only seeks a temporary restraining order enjoining the defendants from contacting any of Bonded Fibers' clients.  Thus, Bonded Fibers must present sufficient

evidence and meet the requirements for a temporary restraining order providing this relief under Federal Rule of Civil Procedure 65(b).  The court's inquiry essentially follows the same analysis as for preliminary injunctions.  *See* **Wagner v. Williford**, No. 89-1696, 1991 WL 59440, at *2 (7th Cir. Apr. 18, 1991); **Government Suppliers Consolidating Services, Inc. v. Bayh**, 734 F.Supp. 853, 861-62 (S.D. Ind. 1990) (noting that a temporary restraining order may be analyzed as a preliminary injunction if the opposing party receives actual notice of the TRO request).

A temporary restraining order is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." **Mazurek v. Armstrong**, 520 U.S. 968, 972, 117 S.Ct. 1865, 1867, 138 L.Ed.2d 162 (1992)(per curiam) (*quoting* 11A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* ß2948, pp. 129-130 (2d ed. 1995).  *See also* **Appenheimer v. School Board of Washington Community School District 308**, No. 01-1226, 2001 WL 1885834, at *3 (C.D. Ill. May 24, 2001); **Government Suppliers**, 734 F.Supp. at 862.  Like a preliminary injunction, "the equitable purpose of a TRO is to minimize hardship to the parties pending the ultimate resolution of the lawsuit."  **Lynch v. Cross**, No. 98 C 1435, 1998 WL 122780, at *1 (N.D. Ill. Mar. 13, 1998) (*citing* **Faheem-El v. Klincar**, 841 F.2d 712, 717 (7th Cir. 1998)).  However, a TRO is an extraordinary equitable remedy which should be granted only with caution.  *See* **Indiana Family and Social Services Administration v. Hospitality House of Bedford**, 704 N.E.2d 1050 (Ind. App.

10

1998); ***Northern Indiana Public Service Company v. Dozier***, 674 N.E.2d 977 (Ind. App. 1996).

To prevail on its motion for a TRO, Bonded Fibers must persuade the court that: (1) its case has a likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted. *See **Incredible Technologies, Inc. v. Virtual Technologies, Inc.***, 400 F.3d 1007, 1011 (7th Cir. 2005).  *See also **FoodComm International v. Barry***, 328 F.3d 300, 303 (7th Cir. 2003) (*citing **Promatek Industries, Ltd. v. Equitrac Corp.***, 300 F.3d 808, 811 (7th Cir. 2002); ***Abbott Labs. v. Mead Johnson & Company***, 971 F.2d 6, 11 (7th Cir. 1992); ***AM General Corp. v. DaimlerChrysler Corp.***, 311 F.3d 796, 803-04 (7th Cir. 2002).  If these three conditions are met, the court must balance the harm to Bonded Fibers if the injunction is not issued against the harm to the defendants if the injunction is issued.  *See **Incredible Technologies***, 400 F.3d at 1011; ***Promatek***, 300 F.3d at 811; ***Ty, Inc. v. Jones Group, Inc.***, 237 F.3d 891, 895 (7th Cir. 2001); ***Abbott Labs***, 971 F.2d at 11-12.  Finally, the court considers "any consequences to the public from denying or granting" the TRO.  ***Promatek***, 300 F.3d at 811.  *See also **Ty, Inc.***, 237 F.3d at 895.  The balancing of harms involves a sliding scale analysis: the greater Bonded Fibers' chances of success on the merits, the less strong a showing it must make that the balance of harm is in its favor.  *See **FoodComm***, 328 F.3d at 303; ***Promatek***, 300 F.3d at 811; ***Ty, Inc.***, 237 F.3d at 895-96.  The trial court's decision to grant or deny a

11

TRO is "entitled to great deference."  *Incredible Technologies*, 400 F.3d at 1011.

The court begins the analysis with two of the three threshold requirements for a temporary restraining order: whether an adequate remedy at law exists and whether Bonded Fibers has established that it will be irreparably harmed in the absence of a TRO.  *See* **Abbott Labs**, 971 F.2d at 19 n.6; **Roland Machine Company v. Dresser Industries, Inc.**, 749 F.2d 380, 386 (7th Cir. 1984) (holding that the absence of an adequate remedy at law is a precondition of any form of equitable relief).  Bonded Fibers need not demonstrate that a remedy at law is wholly ineffectual but rather that the remedy at law is seriously deficient as compared to the harm suffered by it.  *See* **FoodComm**, 328 F.3d at 304 (*citing* **Roland**, 749 F.2d at 386).  When considering irreparable harm, "[t]he only harm that is relevant to the decision to grant a [TRO] is irreparable harm."  **In re Aimster Copyright Litigation**, 334 F.3d 643, 655 (7th Cir. 2003), *cert. denied*, 540 U.S. 1107, 124 S.Ct. 1069, 157 L.Ed.2d 893 (2004).  The relevant harms are only those that accrue between the court's ruling on the motion for a TRO and the entry of a preliminary injunction.  *See* **Abbott Labs**, 971 F.2d at 19 n.6 (*citing* **Roland**, 749 F.2d at 386-87, 391) (noting that in the context of preliminary injunctions, the only harms that are irreparable are "those harms that could not be fully rectified by money damages or injunctive relief at final judgment or, as to the defendant, could not be fully covered by a Rule 65(c) injunction bond.").

12

Here, the court finds that any losses caused by the new Jordan Manufacturing business contacting clients of Bonded Fibers readily could be calculated and remedied by monetary damages. While attempting to frame the issue as a loss of good will, Bonded Fibers essentially is arguing that it will lose the business of its current clients if the defendants are permitted to contact them. However,

> [m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility of adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm. (internal quotations omitted)
>
> ***Sampson v. Murray***, 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974)

Thus, mere economic loss generally will not support an injunction. *See* ***Gateway Eastern Railway Company v. Terminal Railroad Association of St. Louis***, 35 F.3d 1134, 1140 (7th Cir. 1994).

The court finds that based on the testimony set forth at the TRO hearing, the losses alleged by Bonded Fibers appear to be primarily economic. Bonded Fibers has approximately 34 clients and can calculate the amount of purchases made by those clients, as shown by testimony in the hearing that Jordan Manufacturing purchased $450,000 of materials from Bonded Fibers in 2003 and $300,000 in 2004. In addition, the money, time, and resources Bonded Fibers spent developing products for its clients also are categories of loss subject to ready calculation. Bonded Fibers

13

admits that the processes required to develop a product are client-specific, which further serves to define the scope of measurable damages by limiting the independent value of Bonded Fibers' processes.  For these reasons, the court finds that the loss suffered by Bonded Fibers as a result of the new Jordan Manufacturing business can be remedied by a monetary award.

Additionally, Bonded Fibers was put on notice that the defendants were developing a competing business on November 11, 2004, when the president of Air Flow told Trunk that Bounds and Geyer had asked him to help finance a new production facility. In December 2004, Trunk became suspicious when he found sample Bonded Fibers products at the Jordan plant.  In January 2005, Trunk discovered Bounds' plans to set up the new business.  Yet Bonded Fibers did not file suit until April 2005, after the defendants had expended considerable time and energy developing their own business.  The court finds that the equitable doctrine of laches bars the entry of a TRO under these circumstances.

Delay itself works against a party seeking injunctive relief:

> Any unnecessary delay . . . may be viewed as inconsistent with a claim that plaintiff is asserting great injury or, in the case of preliminary injunctive relief, that there is an urgent need for immediate relief and that a judgment would be rendered ineffective unless some restraint is imposed on defendant pending an adjudication on the merits.
>
> 11A Wright, Miller & Kane, *Federal Practice and Procedure*: Civil 2d ß2946 (West 1995 & Supp.)

14

Beyond delay, which is not the sole factor in a laches defense, laches may bar the entry of a TRO when "a party, with knowledge of the relevant facts, permits the passing of time to work a change of circumstances by the other party."  See **State ex. rel. Attorney General v. Lake Superior Court**, 820 N.E.2d 1240, 1256 (Ind. 2005).  Both "an unreasonable lack of diligence by the party against whom the defense is asserted and prejudice arising from this lack of diligence" must be present for laches to bar injunctive relief.  See **DaimlerChrysler**, 311 F.3d at 822 (*quoting* **Hot Wax, Inc. v. Turtle Wax, Inc.**, 191 F.3d 813, 822 (7th Cir. 1999)).

Bonded Fibers cannot maintain that it will be irreparably harmed without a TRO when it delayed five months after explicitly being told by Air Flow that the defendants were starting a competing business and were soliciting its customers.  During those five months, it appears that the defendants hired employees, purchased and/or set-up a new production line, solicited clients, and began the production of materials for those clients.  Bonded Fibers was not diligent in light of these facts, and the defendants would be prejudiced if they are not permitted to make contact with certain businesses that utilize non-woven textiles after expending such resources.

The court concludes that Bonded Fibers has not met its burden of persuasion that a TRO should be granted.  The bases for the court's decision are the failure of Bonded Fibers to establish sufficiently that irreparable harm will occur if the TRO is

not issued coupled with the failure of Bonded Fibers to establish sufficiently that the legal remedy of money damages is an inadequate remedy in this case.

Bonded Fibers does argue that it has demonstrated some success on the merits of its claims.  However, no further analysis is necessary.  See *Roland*, 749 F.2d at 386.  In any case, the court notes that Bonded Fibers argues only that it has a "better than negligible" likelihood of success on the merits, rather than a high likelihood.  (*See* Pl. Mot. for TRO, p. 11) Because Bonded Fibers cannot establish the other two preliminary requirements for a TRO, a weak showing on the third requirement further indicates that a TRO would not be appropriate in this case. However, the court expresses no comment on Bonded Fibers' likelihood of success on the merits, which the court will consider at a later time, should Bonded Fibers continue to pursue a preliminary injunction.

_____

For the foregoing reasons, the Motion for Temporary Restraining Order filed by the plaintiff, Bonded Fibers Midwest, Inc., on April 13, 2005 is **DENIED**.

ENTERED this 3rd day of May, 2005

                              s/ ANDREW P. RODOVICH
                                United States Magistrate Judge

16